# The President's Authority to Control the Export of Hazardous Substances

The Export Administration Act of 1979 continued the President's authority under its predecessor statute to control exports of hazardous substances for foreign policy purposes.

The statutory criteria for a decision to impose export controls set forth in § 6(e) of the 1979 Act are not binding on the President, although he must specify his conclusions with respect to these criteria in a report to Congress.

Certain statutes imposing conditions on the export of specific hazardous substances may foreclose or limit presidential discretion to take some actions under the 1979 Act.

April 11, 1980

## MEMORANDUM OPINION FOR THE SPECIAL ASSISTANT TO THE PRESIDENT FOR CONSUMER AFFAIRS

This responds to your request for our opinion whether the Export Administration Act of 1979, Pub. L. No. 96–72, 93 Stat. 503 (1979), 50 U.S.C. App. § 2401 (Supp. III 1979), provides authority for the President to control the export of hazardous substances in' pursuit of the foreign policy of the United States. We conclude that the Act does provide such authority. You have also asked whether the President, in exercising such authority, is formally bound by the factors for his consideration that are set forth in § 6 of the 1979 Act. We conclude that he is not.

### I. Substantive Authority to Control Exports of Hazardous Substances

In a memorandum dated January 30, 1979, to the Deputy General Counsel of the Department of Commerce, we concluded that the 1979 Act's predecessor statute, the Export Administration Act of 1969, gave the President authority to control exports of hazardous substances for foreign policy purposes. The issue, then, is whether the 1979 Act continued this authority or modified it in any respect.

The Act's operative language for foreign policy controls was left essentially unchanged in 1979. It authorizes the President to "prohibit or curtail the exportation of any goods, technology, or other information . . . to the extent necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations." Section 6(a)(1) of the 1979 Act, 93 Stat. 503, 513, 50 U.S.C.

568

App. § 2405(a)(1) (Supp. III 1979). Although the phrase "foreign policy" is not defined in either the 1969 or the 1979 statute, Congress provided some explanatory legislative history in 1979. It did so in the course of separating authority for foreign policy controls from that for national security controls, and providing different criteria and procedures for each. In the House of Representatives, where the separation originated, the report of the Committee on Foreign Affairs explained how these two sources of authority differ:

> The purposes of foreign policy controls are more vague and more diffuse. The purposes can range from changing the human rights policy of another country; to inhibiting another country's capacity to threaten the security of countries friendly to the United States; to associating the United States diplomatically with one group of countries as against another; to disassociating the United States from a repressive regime. Unlike the situation with national security controls, some of these foreign policy purposes may be served by denying exports even where foreign availability exists. (In the hypothetical case frequently mentioned in hearings and markup, the United States would not want to export thumbscrews, even if other countries were doing so.) Since decisions on foreign policy controls are often more political than technical, congressional involvement in those decisions is more appropriate than in the case of national security controls.

H.R. Rep. No. 200, 96th Cong., 1st Sess. 7 (1979) (hereinafter 1979 House Report).

The Report's emphasis on the range of purposes that foreign policy controls may serve suggests strongly that controls on exports of hazardous substances are included. The conference report provides further support in its statement that this authority "encompasses the full range of U.S. foreign policy goals." H.R. Conf. Rep. No. 482, 96th Cong., 1st Sess. 43 (1979).

The 1979 Act provides definitions of the terms "good" and "technology" as used in § 6. These are certainly broad enough to include hazardous substances. Under § 16(3), 50 U.S.C. App. § 2415, "good" is defined to mean "any article, material, supply or manufactured product, including inspection and test equipment, and excluding technical data." 50 U.S.C. App. § 2415. The term "technology" is defined by § 16(4) to mean "the information and know-how that can be used to design, produce, manufacture, utilize, or reconstruct goods, including computer software and technical data." *Id.*

## II. Procedure for Imposing Foreign Policy Controls

Procedurally, § 6(e) of the 1979 Act requires that the President "in every possible instance shall consult with the Congress before imposing" foreign policy controls. 93 Stat. 514, 50 U.S.C. App. § 2405(e). Upon imposing the controls, the President must report to Congress, specifying his conclusions with respect to a set of criteria for decisions set forth in § 6(b) of the Act. *Id.* On their face, these criteria are not significantly confining of presidential discretion. For example, the President is to consider the probability that controls will achieve the intended foreign policy purpose in light of such factors as foreign availability of the goods. Moreover, the legislative history is clear that these criteria "are to be taken into consideration, but they are not conditions which must be met." 125 Cong. Rec. 19937 (1979) (Statement of Senator Stevenson on introducing S. 737). The committee reports confirm this interpretation. *See* 1979 House Report at 20 ("Having considered these criteria, the President is not strictly bound by them."); S. Rep. No. 169, 96th Cong., 1st Sess. 8 (1979) (provision "did not establish criteria to be met but factors to be considered, and recognized that the President, having considered them, might find one or more of the factors irrelevant to a decision to impose or remove controls.").

Section 6(e)(2) also requires the President to report any alternative means that were attempted to achieve the purposes of the controls, or his reason for eschewing them, 50 U.S.C. App. § 2405(e)(2); § 4(c) of the Act allows the President to impose foreign policy controls only on a determination that the embargoed goods cannot be replaced through sources outside of the United States, "unless the President determines that adequate evidence has been presented to him demonstrating that the absence of such controls would prove detrimental to the foreign policy or national security of the United States." 50 U.S.C. App. § 2403(c).

### III. Conclusion

Thus we conclude that under the Export Administration Act of 1979, the President may control the export of hazardous substances in appropriate circumstances. We would enter one caveat, however. Certain statutes presently impose conditions on the export of hazardous substances, *e.g.*, the Toxic Substances Control Act, 15 U.S.C. § 2611(b)(1), requiring notice to the recipient nation of product risks. It may be that these statutes foreclose presidential discretion to take some actions, for

example banning a product that a statute allows to be exported if notice is given. In the absence of a specific proposal, we have not researched such questions, and wish merely to alert you to them.

LEON ULMAN
*Deputy Assistant Attorney General*
*Office of Legal Counsel*